UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LISA NELSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | No. 4:21 CV 323 DDN |
| ) | |
| KILOLO KIJAKAZI,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Lisa Marie Nelson for supplemental security income under Title XVI of the Social Security Act. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.  BACKGROUND

Plaintiff Lisa Marie Nelson, who was born on July 13, 1980, protectively filed her application for supplement security income on December 11, 2018. (Tr. 366, 401.) She alleged disability due to bipolar disorder, anxiety, depression, panic attacks, "feet problems," thyroid removal, and learning disability. (Tr. 407.) Her application was denied

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. See 42 U.S.C. § 405(g) (last sentence).

on March 4, 2019, and she timely requested a hearing before an administrative law judge (ALJ).  (Tr. 272, 277.)

On June 4, 2020, plaintiff testified before an ALJ.  (Tr. 236-260.)  On July 7, 2020, the ALJ issued an unfavorable decision, concluding that plaintiff was not disabled.  (Tr. 8.) The Appeals Council denied plaintiff's request for review on January 14, 2021.  (Tr. 1.) The decision of the ALJ therefore stands as the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).

## II.  MEDICAL AND OTHER HISTORY

The following is a summary of plaintiff's medical and other history relevant to this appeal.

From March 2018 to October 2020, plaintiff saw Dr. C.J. Jos, psychiatrist.  She consistently reported mood swings and anxiety, sometimes accompanied by impulsivity, anger problems, and memory problems.  She occasionally reported panic attacks, including one where she had to stop driving.  Dr. Jos also consistently noted plaintiff's depressed and/or anxious mood and affect, and plaintiff was occasionally emotional during the appointments.  She generally showed good orientation, judgment, and insight about her mental health.  Dr. Jos diagnosed her with bipolar disorder type 2 and generalized anxiety disorder, and he continuously adjusted her medications.  (Tr. 161-62, 175, 184, 194, 206, 230, 494-500, 519-20, 696, 873, 917.)

On March 20, 2018, plaintiff saw Dr. Donald Goeller, primary care physician, to establish care and for back pain.  He diagnosed her with mild persistent asthma, obesity, and chronic bilateral low back pain.  Her review of systems and physical exam were normal, except for decreased range of motion and tenderness in her low back.  Dr. Goeller discussed treatment options with plaintiff and noted the link between obesity and back pain. (Tr. 464-68.)  She followed up with Dr. Goeller on May 31, 2018; her conditions were stable, and her physical exam was normal.  (Tr. 472.)

On May 22, 2018, plaintiff was hospitalized at St. Anthony's Medical Center for depression, reclusiveness, and suicidal ideation.  Her husband found her locked in the

bathroom, holding a knife and all of her medications.  She identified the precipitating event as remembering past abuse.  After admission, she denied suicidal ideation, stating that she was reading her medication labels and using the knife to open her pain patches.  Her symptoms included fear that her father and brother would kill her children, paranoid and circumstantial thoughts, anxious mood, and hyperthymic affect.  She was discharged on May 25, 2018.  (Tr. 741-44, 765.)

On May 30, 2018, plaintiff underwent an MRI.  The MRI demonstrated lateral disc herniation at L3-L4 and mild diffuse disc bulging, annular tear, and lateral disc herniation at L4-L5, resulting in stenosis.[2]  (Tr. 474.)

On June 26, 2018, plaintiff established care with Richard A. Covert, MD, occupational medicine specialist.  She stated that her back pain started 18 months prior, with her pain worsening over the previous month.  Dr. Covert noted that she was very anxious and hyperresponsive to light palpation and reflex testing; she was sore on light palpation of her left hip, buttocks, and hamstring.  She could heel and toe raise, but she refused to squat.  Her range of motion was fairly well preserved except for flexion and extension.  (Tr. 720, 724.)

On June 29, 2018, plaintiff saw Corri Payton, nurse practitioner (NP), for neck pain.  During the physical exam, plaintiff had forward head posture, was tender to palpation along her neck, and felt discomfort when moving her neck in all directions.  Her side bending was restricted, but she demonstrated 5/5 strength in her hands, arms, legs, and ankles.  She was able to heel, toe, and tandem walk.  (Tr. 483.)

On August 27, 2018, plaintiff met with Licensed Clinical Social Worker (SW) Steven Buck for home-based therapy.  She had a positive attitude and stable mood, and she stated that she had been doing better.  (Tr. 848.)  Plaintiff met with Mr. Buck throughout October 2018.  On October 4, she stated that she had been having a bad week due to memories of past abuse, which led to conflicts with her husband, crying spells, staying in

---

[2] Stenosis is a narrowing of the spinal canal in the lower part of one's back, causing pressure on the spinal cord and/or nerves.  https://www.hopkinsmedicine.org/health/conditions-and-diseases/lumbar-spinal-stenosis.

bed all day, and depressed mood.  Her insight and judgment were fair.  (Tr. 846.)  On October 11, plaintiff reported a stable week.  While she had good days and bad days, she was able to use positive coping skills to help with the symptoms of depression.  (Tr. 844.)  On October 18, plaintiff reported continued depression due to family issues, stating that money was tight and that she worried about providing for her children.  She also said that working towards her GED was stressful.  (Tr. 842.)  On October 25, she reported mild depression but an otherwise stable week, with stresses similar to what she reported the prior week.  Her behavior was withdrawn, with minimal eye contact and a disheveled appearance.  (Tr. 840.)

Plaintiff met with SW Buck twice in December 2018 and once in January 2019.  She stated that insurance issues caused a lapse in therapy in November.  During each session, she reported continued depression due to family and financial issues.  Her appearance was disheveled, she appeared withdrawn, and she made minimal eye contact.  (Tr. 834-38.)

On February 21, 2019, plaintiff followed up with NP Payton for low back pain.  She described her back pain as sharp, burning, and severe in the left lower back, with radiation into her hip, thigh, and ankle.  She also reported poor sleep.  Her gait was normal, but she had restricted range of motion, discomfort in her lumbar back, and some tenderness.  She sat slightly slumped to the left.  NP Payton ordered an MRI and physical therapy.  (Tr. 533-34.)

Also on February 21, 2019, plaintiff met with SW Buck and reported continued depression due to family and financial issues.  She showed difficulty expressing herself, and her mood was depressed.  On March 7, 2019, plaintiff reported a stable week with no major episodes of depression.  Her thought and perception were within normal limits, and her insight was fair.  (Tr. 830-32.)

On March 25, 2019, plaintiff underwent a physical therapy evaluation with physical therapist (PT) Maggie Bauman, DPT, for lower back and hip pain.  She reported bilateral hip pain, which felt like burning, especially when she tried to lay down on her side.  She also said she had lower back pain that radiated to other areas.  She used a cane on occasion but didn't like the stigma that came along with it, so she limited its use in the community.

The strength in her right leg was 3+/5, and her left leg was 3/5.  PT Bauman recommended physical therapy twice per week for eight to ten weeks.  (Tr. 662-65.)  Plaintiff followed up with Ms. Bauman on April 1, 4, and 10, 2019.  (Tr. 611, 620, 633.)

On March 26, 2019, plaintiff underwent an MRI of her left hip.  It demonstrated moderate left and mild right bursitis,[3] as well as mild bilateral gluteus minimus tendinopathy[4] with not tendon tear or muscle atrophy.  (Tr. 553.)

On April 4, 2019, plaintiff followed up with NP Payton.  She reported that, with physical therapy, ice, and core strengthening, her back and hip pain had improved.  She described continuing aching discomfort in her neck, which triggered headaches.  Testing her range of motion caused discomfort, and she was tender to palpation.  (Tr. 552.)

Also on April 4, 2019, plaintiff underwent an x-ray of her cervical spine.  The x-ray demonstrated mild degenerative disc disease at C4-C5 with degenerative retrolisthesis.[5]  (Tr. 731.)

On May 8, 2020, plaintiff underwent an annual psychosocial assessment.  She said that she was a nervous person and got overwhelmed easily.  She reported that she did not have the energy to engage in some self-care activities, like bathing.  She liked to read and to swim because it helped her move around.  She reported experiencing suicidal ideation within the previous year.  The clinician performing the assessment noted plaintiff's depressed mood, decreased interest in activities, fatigue, hypersomnia, crying spells, negative feelings about herself, feelings of guilt, suicidal ideation, and history of self-harm.  (Tr. 218-220, 225.)

---

[3] Bursitis is inflammation of the bursae, which are small, fluid-filled sacs that cushion the bones, tendons, and muscles near joints.  https://www.mayoclinic.org/diseases-conditions/bursitis/symptoms-causes/syc-20353242.

[4] Tendinopathy describes any tendon condition that causes pain and swelling. https://my.clevelandclinic.org/health/diseases/22289-tendinopathy.

[5] Retrolisthesis is the backwards slippage of one vertebral body onto another. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278018/.

Plaintiff continued to attend physical therapy through May 2019. On May 10, plaintiff reported that she had continued back, hip, and neck pain. She said she had difficulty holding objects, especially overhead, as well as difficulty driving and holding conversations when she had to look side to side; she also reported daily headaches. She said walking was getting more difficult, she could barely walk into a store, and she struggled with stairs and with dressing herself. (Tr. 595.) On May 23, plaintiff reported an annoying ache or pressure in her neck all the time, with pain worse when she turned her neck to the right. She experienced shooting pain in her back and burning pain in both of her hips, which made walking very painful. Plaintiff's physical therapist adjusted the cane for proper fit, which helped her walk more effectively. (Tr. 582, 585.) On May 30, plaintiff reported that her neck was doing better and that she was able to turn her head better lately, but her left hip was bothering her. (Tr. 570.) Plaintiff discontinued physical therapy on July 16, 2019, due to financial problems. (Tr. 561.)

On August 9, 2020, plaintiff went to the emergency department (ED) at Mercy Hospital South with complaints of bilateral foot and ankle pain. An x-ray showed bilateral heel spurs but no other abnormalities. (Tr. 87-88.)

On September 4, 2020, plaintiff visited Elizabeth Lillmars-Stephens, family nurse practitioner, for primary care. NP Lillmars-Stephens noted that plaintiff moved her extremities well, had normal gait, and was in no acute distress, but she walked "with care." (Tr. 198-200.)

On November 16, 2020, plaintiff went to the Emergency Department at Mercy Hospital South to request an evaluation for back pain. Her physical exam was normal aside from her lumbar back, where she exhibited pain but normal range of motion and no tenderness. Her strength was 5/5 in her arms and legs, and she walked into the ED without difficulty. The provider in the ED prescribed short-term pain medication, counseled plaintiff about her symptoms, and encouraged her to follow up for rehabilitation. (Tr. 77-80.)

On December 1, 2020, plaintiff established care with Dr. Bernard Randolph, physiatrist, for low back pain. She said that she had been experiencing low back problems

for four to six years but that the symptoms were usually short-lived and responded to conservative measures.  Her physical exam showed no pain or tenderness in her neck.  The straight leg raise was positive on the left while she was both seated and lying.  She showed a flexed posture and decreased stride length, used a cane, and required assistance for transitional movements.  Dr. Randolph ordered an MRI.  (Tr. 140-44.)

On December 16, 2020, plaintiff underwent a physical therapy evaluation by PT Paden Norrick.  She stated that her low back pain had recently increased and that she had been experiencing intensified hip and leg pain over the past day.  She described her pain as aching, sharp, and cramping, and it caused her to feel unsteady on her feet.  PT Norrick described her as being in visible pain with posturing and labored movements.  She was unable to complete the flexibility assessment due to pain.  Her hip strength and hip extension were 3/5 bilaterally, and her knee extension, knee flexion, and ankle dorsiflexion were 4/5 bilaterally.  She needed extra time and support to transition into sitting and standing.  Her pain level after treatment was 9/10, and her prognosis was poor.  (Tr. 38-43.)

Plaintiff underwent an MRI on December 22, 2020.  The MRI showed diffuse disc bulge at T12-L1; mild disc bulge at L2-L3; mild disc bulge, worse on the left, at L3-L4 and L4-L5; and central disc protrusion at L5-S1.  The clinical impression was mild lumbar degenerative disc and joint disease, most pronounced at L3-L4 and L4-L5.  (Tr. 75-76.)

**ALJ Hearing**

Plaintiff appeared at a hearing before an ALJ on June 4, 2020, and testified to the following.  She lives with her husband and three children.  She has a valid driver's license, and she drives once every two weeks.  She finished tenth grade and has not gotten her GED, though she was working on it from home, due to mental issues.  She has not worked since 2010 and does not have health insurance.  She previously worked for a steak house as a server; the heaviest weight she lifted was about 25 pounds, and she would request help with heavy trays due to neck pain from a car accident when she was younger.  (Tr. 242-44.)

She experiences pain in her lower back, which also affects her hip and left leg. Moving exacerbates the pain, but standing in place is the hardest. If she stands on a hard surface, she notices the pain within minutes; she can stand at home without holding onto anything for 20 minutes before needing to sit down due to pain. On a good day, she can walk for about 40 minutes, but she will not be able to move for a couple days after that. When she is in a store, she holds onto a cart for support. She also uses a cane daily, which she started using in the past two years. She only sits in one chair at home because she needs back support, and she cannot always lie flat. She also experiences pain in her neck. She cannot lift anything over her head, and she struggles to turn her neck. Her neck pain radiates into her left arm, which feels like weakness and cramping. (Tr. 245-49.)

On a typical day, she makes a glass of Kool-Aid for her son, folds laundry, and cleans the sink and the toilet when she is able to bend. Her older son does the laundry and takes out the trash, and her daughter washes the dishes. She spends a lot of time sitting isolated in her room. She passes the time during the day by reading, but she also spends a lot of time worrying. She has panic attacks throughout the day, which cause her to feel like she cannot breathe, as well as sharp pain and blurred vision. She can experience one after another. Her panic attacks are triggered by simple things, and they can last between seven and forty minutes. She sleeps in bed alone due to her discomfort. Pain and nightmares prevent her from sleeping through the night, so she normally wakes up every three hours. (Tr. 250-53.)

Plaintiff has been seeing a psychiatrist since about 2011. She takes medication for anxiety and panic attacks but does not feel that they help. She has tried other medications but always comes back to the ones she is currently taking. She experiences dry mouth due to her medications and feels nervous 90 percent of the time. (Tr. 254-55.)

### III.  DECISION OF THE ALJ

On July 7, 2020, the ALJ issued a decision finding plaintiff was not disabled. (Tr. 11-20.) At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 11, 2018, the date that she protectively filed her application. At

Step Two, the ALJ found that plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spines, bursitis, morbid obesity, and bipolar disorder. At Step Three, the ALJ determined that plaintiff did not have any impairment or combination of impairments that met or medically equaled the severity of any presumptively disabling impairment contained in 20 C.F.R. part 404, subpart P, appendix 1.  (Tr. 13-15.)

At Step Four, the ALJ found that plaintiff has the residual functional capacity (RFC) to perform a range of sedentary work with the following exertional and non-exertional limitations.  She cannot climb ramps, stairs, ladders, ropes, or scaffolds; kneel, crouch, or crawl; push with her left upper arm more than occasionally; or reach overhead with her left arm.  She can occasionally stoop.  She is limited to occupations that can be performed while using a handheld assistive device, like a cane, for walking and standing.  She should avoid extreme vibration, all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery.  She is limited to occupations that involve only simple, routine, and repetitive tasks with only occasional changes in the work setting and only casual and infrequent contact with the public and with co-workers.  (Tr. 15-19.)

Based on vocational expert hearing testimony, the ALJ concluded that plaintiff could not perform her past relevant work but could perform other work that exists in significant numbers in the national economy, including the occupations of bench hand, document preparer, and film board touch-up inspector.  Consequently, the ALJ found that plaintiff was not disabled.  (Tr. 19-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."

*Id*. In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Id*. As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The Court will not "disturb the denial of benefits so long as the ALJ's decisions falls within the available zone of choice." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (citation omitted).

  To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

  Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant has the RFC to perform her past relevant work (PRW). 20 C.F.R. §§ 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id*.; 20 C.F.R. §§ 404.1520(a)(4)(v).

## V.  DISCUSSION

### Residual functional capacity

Plaintiff first argues that the ALJ made his own inferences about her RFC without support from an acceptable medical source. (Doc. 28 at 4.)  She contends that the ALJ did not sufficiently account for how her panic attacks affect her ability to work, citing to her testimony during the ALJ hearing for support. (*Id*. at 6; Tr. 252-53.)  She also argues that the ALJ's conclusions with respect to her physical limitations were conclusory, and the ALJ did not specify how plaintiff's obesity affects or is affected by her other conditions. (Doc. 28 at 7.)

Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).  The claimant has the burden to establish her RFC. *Mabry v. Colvin,* 815 F.3d 386, 390 (8th Cir. 2016).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace," but "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  The RFC need only include the limitations supported by the record. *Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006).  Though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Winn v. Comm'r, Soc. Sec. Admin.*, 894 F.3d 982, 987 (8th Cir. 2018).

Regarding her mental impairments, the ALJ concluded that she was no more than moderately limited by her bipolar disorder.  The ALJ acknowledged plaintiff's symptoms, including tearfulness, anxiety, tangential thought, and appearing disheveled, but noted that her mental status exams were mostly normal. (Tr. 16-17.)  While plaintiff frequently reported depression, anxiety, crying spells, and mood swings, her treating psychiatrist, Dr.

Jos, consistently noted that she was alert and oriented with no delusions or hallucinations and good insight and judgment. (Tr. 162, 183-84, 206, 231, 494-500, 519-20, 697.) Her mental status exams were generally normal. (*Id*.) In assessing the severity of her mental impairments, the ALJ concluded that she had a mild limitation in understanding, remembering, or applying information; moderate limitations in interacting with others and concentrating, persisting, or maintaining pace; and no limitation in adapting or managing herself. (Tr. 14.) Relying on substantial evidence in the record, the ALJ properly accounted for plaintiff's limitations in creating an RFC with simple, routine tasks; occasional changes in the work setting; and casual, infrequent contact with the public and co-workers. (Tr. 15.)

Plaintiff specifically cites her panic attacks as interfering with her ability to work. (Doc. 28 at 6.) She testified to the severity and effects of her panic attacks at the hearing before the ALJ. (Tr. 252-53.) On June 10, 2019, and January 9 and April 16, 2020, she reported panic attacks, but these are the only panic attacks reflected in the medical record. (Tr. 682, 873, 918.) Additionally, plaintiff attributed at least one set of panic attacks to a new medication. (Tr. 682.) The evidence in the record does not establish that plaintiff's panic attacks are so severe and persistent that they would prevent her from working. The ALJ's conclusion as to plaintiff's mental RFC was based on substantial evidence.

Turning to plaintiff's physical impairments, the ALJ concluded that, despite evidence of severe impairments, plaintiff retained the capacity to perform sedentary work with some limitations. In reaching this conclusion, the ALJ considered plaintiff's subjective complaints as well as objective findings, including imaging of her spine and range of motion and strength assessments. (Tr. 18, 474, 487, 531, 533, 550, 552, 573, 725, 731, 735.) The ALJ noted that plaintiff's cervical and back pain improved with physical therapy, and her overall treatment was conservative; she was not prescribed narcotics nor recommended for surgical intervention. (Tr. 17.)

Plaintiff's contention that the ALJ failed to properly assess the effect of obesity on her level of functioning is unavailing. "[W]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal."

*Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009). Though plaintiff did not allege obesity as one of her disabling impairments, the ALJ found it to be severe and a cause of significant limitation. (Tr. 13, 18, 407.) The ALJ further asserted that he accounted for obesity, particularly postural and exertional limitations, in determining that plaintiff could perform sedentary exertional work with some additional limitations. (Tr. 13.) The ALJ is not required to make any particular findings as to obesity, and the accounting for obesity in his decision is legally sufficient.

Plaintiff also argues the ALJ substituted his own judgment for that of the medical experts and that he should have developed the record to obtain an opinion from a medical professional. While the ALJ does have a duty to fully and fairly develop the record, the ALJ can issue a decision without obtaining additional evidence when other record evidence provides a sufficient basis for a decision, such as the case here. *See Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013). Here, the longitudinal record of treatment supported the ALJ's RFC finding, and no further development was needed. The Court also notes that plaintiff is not asserting that the ALJ is missing medical records from the relevant period, but that the ALJ should have obtained additional opinion evidence relating to this period. Although it is the ALJ's responsibility to formulate the claimant's RFC, the burden is on the claimant to establish the limitations contained in the RFC. *See Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016). Plaintiff could have submitted opinion evidence relevant to the period at issue to support her claim. However, the ALJ had all the relevant treatment records and at the hearing plaintiff's counsel confirmed that the record was complete. (Tr. 240-41.) The ALJ's conclusion as to plaintiff's RFC is supported by substantial evidence.

**Plaintiff's subjective complaints**

Plaintiff also contends that the ALJ failed to consider some of the *Polaski* factors in evaluating her subjective complaints. (Doc. 28 at 9.) Part of the RFC determination includes an assessment of plaintiff's credibility regarding subjective complaints. Using the *Polaski* factors, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also*

*Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting *Polaski* factors must be considered before discounting subjective complaints).  The *Polaski* factors include (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322; see also 20 C.F.R. § 416.929(c)(3).  "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

Here, the ALJ considered the *Polaski* factors.  The ALJ is "not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).  The ALJ found that plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms, but they were not entirely consistent with the medical evidence.  In making his determination, the ALJ made findings as to precipitating and aggravating factors, as well as plaintiff's functional restrictions due to both her physical and mental impairments.  He noted that plaintiff's degenerative disc disease, bursitis, obesity, and resulting pain are exacerbated by increased activity.  He noted that plaintiff requires the use of a handheld assistive device, like a cane, to walk and stand, due to her lumbar degenerative disc disease and obesity.  He accounted for her moderate limitations in concentrating, persisting, and maintaining pace and interacting with others by limiting her non-exertional tasks.  (Tr. 18.)

The ALJ also considered plaintiff's daily activities, including making a drink for her son, folding laundry, cleaning the sink, cleaning the toilet, moving around for strength, and shopping in stores, sometimes with the help of her son.  (Tr. 16.)  As to plaintiff's objection to the ALJ's characterization and consideration of her activities, although activities such as light housework are not alone sufficient to prove a claimant can work, the extent of plaintiff's activities, when considered in conjunction with the medical record in this case, supports the ALJ's decision. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015).

      The regulations for pain evaluation also state that the ALJ should also consider the type of treatment that the claimant receives when evaluating pain. *See* 20 C.F.R. § 416.929. In doing so, the ALJ may consider conservative treatment when evaluating credibility. *See Gonzales v. Barnhart*, 465 F.3d 890, 892 (8th Cir. 2006). The ALJ noted that plaintiff was treated with medication and physical therapy. (Tr. 17); *see Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (if claimant can control her impairment by treatment or medication, she fails to show disability). She reported that with physical therapy, ice, and core strengthening, her back and hip pain had improved. (Tr. 552.) She also improved her cervical range of motion and right hip strength and stability. (Tr. 573.) Physical therapy notes mention poor attendance and questionable adherence to her home exercise program. (Tr. 598.) The ALJ properly considered the *Polaski* factors in discounting plaintiff's subjective complaints.

## **CONCLUSION**

      For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


                                    /s/ David D. Noce  
                              **UNITED STATES MAGISTRATE JUDGE**

Signed on August 22, 2022.